UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH USA INC., <br><br> Plaintiff, <br><br> -against- <br><br> MICHAEL MACHUA MILLETT and NORTHEAST SERIES OF LOCKTON COMPANIES, LLC, <br><br> Defendants. | Case No.: 22 CV 6656 <br><br> **DECLARATION OF JAMES BEATTY** |

James Beatty, declares under 28 U.S.C. § 1746 and subject to the penalties of perjury that the following is true and correct:

1. I am a Managing Director and the Financial and Professional Liability (FINPRO) Practice Group Leader at Marsh USA Inc. In this capacity, I oversee Marsh's FINPRO Practice in the U.S. and Canada, including Marsh's special purpose acquisition company (SPAC) group where Plaintiff Michael Machua Millett ("Millett") formerly worked.

2. I submit this declaration in support of Marsh's Order to Show Cause seeking a temporary restraining order, a preliminary injunction, and expedited discovery. Unless otherwise stated, I make this declaration based on my personal knowledge and Marsh's books and records.

3. Marsh is a global leader in insurance brokering and risk management, bringing global, national, and industry-specific solutions.

4. I have worked for Marsh since September 2010. Before I became the FINPRO Practice Group Leader for Marsh in 2022, I worked as worked as the Leader of Marsh's Private Equity Mergers and Acquisitions (PEMA) Group within FINPRO (2015-2020), and as Marsh's FINPRO PEMA U.S. Placement Leader (2020-2022).

**Millett's Employment**

5. Millett began his employment with Marsh in June 2010 as Senior Client Advisor and Global GPL Practice Leader within Marsh's FINPRO Department in the Boston, Massachusetts office.

6. Millett's corporate title for Marsh was Senior Vice President. He was later promoted to Managing Director in or about 2015.

7. Before joining Marsh, Millett had no experience working in the insurance industry. He was a commercial lawyer in private practice who brought no clients with him from his law firm job.

8. Between 2010 and 2020, Millett primarily worked on Marsh's PEMA team performing claim advocacy and product work.

9. Then, in 2020, Marsh appointed Millett as the leader of its special purpose acquisition company ("SPAC") group, working with investors who had formed SPACs to raise capital for initial public offering and for acquiring or merging with companies, .

10. In this new role, Millett led a team of risk specialists in helping SPAC clients identify risks, customize programs, and secure directors and officers liability (D&O) insurance policies throughout the life cycle of the SPAC, including the ultimate merger, known as a de-SPAC transaction. He marketed Marsh's SPAC expertise and solutions to potential SPAC clients, and serviced SPAC clients originated by other Marsh employees.

11. Millett relied on financial and internal resources from Marsh to generate business, service clients, and manage client relationships. He developed client relationships because of his employment, and supported by an experienced team of Marsh employees, on whom he relied on to carry out his job duties.

12. Marsh also supported Millett's client-facing role by financing client-related expenses, sponsoring client events, and investing in marketing collateral and sales tools, all of which Millett used to form and strengthen client relationships.

### Millett's Exposure to Confidential Information

13. In his position for Marsh, Millett became intimately familiar with Marsh's confidential information, including, without limitation:

- Client lists and client contact information, including phone numbers and email
- addresses, and documents compiling information about Marsh's clients;
- Prospective client lists and target businesses;
- Current and historical client account information, including client needs and
- preferences, insurance, and purchasing and buying preferences, premium
- amounts, terms of insurance policies, loss ratios, and experiences, exposure data, surety needs, and arrangements, and compilations of them;
- Financial information, such as client pricing information and revenue received per client, and compilations of them;
- Insurance program, project, and carrier information;
- Marsh's business development plans, products, strategies, revenue projections, financial planning, and accounts receivable information;
- The terms of Marsh's agreements and financial arrangements with its clients;
- Marsh's internal operating, management, selling, marketing, and administrative materials;
- Marsh's methods, processes, proprietary databases, and benchmarking analyses; and
- Marsh's sales, marketing, and business strategies.

14. Marsh protects its confidential information by requiring that such information be stored and remain on Marsh's password-protected network and devices, including the phones and laptops Marsh provided Millett and the databases to which it gave him access.

15. Marsh also protects its confidential information, and its client relationships and goodwill, by requiring employees with access to confidential information to sign non-solicitation agreements and confidentiality agreements.

## Millett's Non-Solicitation Agreements

16. During his employment with Marsh, Millett signed several non-solicitation agreements, which provided him with various economic benefits in exchange for certain post-employment obligations (collectively, the "Non-Solicitation Agreements").

17. On June 29, 2010, in exchange for his employment by Marsh, eligibility to participate in certain bonus compensation plans, and access to confidential information—all of which he received—Millett signed a Marsh USA Inc. Non-Solicitation Agreement, a copy of which is attached as **Exhibit A** (the "Marsh Non-Solicitation Agreement").

18. By signing the Marsh Non-Solicitation Agreement, Millett acknowledged that as an employee of Marsh he would have contact with a significant number of Marsh's clients and prospective clients, and would have access to confidential information relating to those clients and prospective clients. *See* Exhibit A.

19. Millett agreed that for twelve months following his separation from employment with Marsh he would not: (i) solicit Marsh's clients for the purpose of selling or providing consulting services, projects, or products of the type sold or provided by Marsh; (ii) induce clients or prospective Marsh clients to terminate, cancel, or discontinue business with Marsh, or (iii) perform or supervise the performance of consulting services, projects, or products of the type sold or provided by Marsh to any Marsh clients or prospective clients.

20. These nonsolicitation restrictions were limited only to those clients or prospective clients of Marsh with whom Millett had contact or about whom Millett obtained confidential information within the last two years of his employment with Marsh.

21. By signing the Marsh Non-Solicitation Agreement, Millett acknowledged that his breach of these nonsolicitation obligations would result in irreparable injury to Marsh for which

monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the nonsolicitation obligations, Marsh would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.

22. In addition, in exchange for his receipt of the Company's Long Term Incentive awards of restricted stock (which he received), most recently on or about March 20, 2022, Millett electronically signed and agreed to be bound by a Restrictive Covenants Agreement with MMC and its affiliates and subsidiaries (including his employer, Marsh). Attached as **Exhibit B** is a copy of this agreement, together with Millet's electronically signed grant agreement (the "MMC Restrictive Covenants Agreement").

23. In the MMC Restrictive Covenants Agreement, Millett again acknowledged that solely by reasons of his employment with Marsh, he had and would "come into contact with and develop and maintain relationships with a significant number of [Marsh's] clients and prospective clients." *See* Exhibit B.

24. Thus, like the Marsh Non-Solicitation Agreement, the MMC Restrictive Covenants Agreement prevents Millett, for twelve-month period following his employment, from soliciting certain Marsh clients, and certain Marsh affiliate clients, for the purpose of selling or providing products or services of the type he sold or provided while employed by the Marsh. *See* Exhibit B.

25. This restriction is narrowly to cover only those Marsh clients and affiliate clients with whom Millett had contact or confidential information about during the final two years of his employment with Marsh.

26. Millett expressly acknowledged and agreed that the nonsolicitation restriction in the MMC Restrictive Covenants Agreement were reasonable and necessary to protect Marsh's

legitimate business interests, were reasonable in view of the consideration he would receive for signing the agreement, and would not prevent him from obtaining employment within his field of expertise.

27. Millett also acknowledged that his breach of the nonsolicitation obligations in the MMC Restrictive Covenants Agreement would result in irreparable injury to Marsh for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the nonsolicitation obligations Marsh would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.

28. In exchange for Millett's promises in the Non-Solicitation Agreements, Marsh compensated him handsomely.

29. Between September 2019 and February 2022, Marsh granted Millett 703 stock units, in four separate annual grants (2019, 2020, 2021, and 2022) valued at more than $550,000.

30. Marsh also issued a restrictive cash award to Millett in July 2021 that was worth $400,000 when fully-vested.

31. These large grants were in addition to Millett's regular six-figure annual salary.

### Millett's Confidentiality Agreements

32. On the same day Millett signed the Marsh Non-Solicitation Agreement (June 29, 2010), Millett also signed a Marsh USA Inc. Confidentiality Agreement, a copy of which is attached as **Exhibit C** (the "Marsh Confidentiality Agreement").

33. By signing the Marsh Non-Solicitation Agreement, Millett acknowledged that as an employee of Marsh he would learn or have access to highly confidential and sensitive information and trade secrets about Marsh, its operation, and its clients. *See* Exhibit C.

34. Millett also acknowledged that Marsh is engaged in a highly competitive business and that its competitive position depends on its ability to maintain the confidentiality of confidential information Marsh developed, compiled, and acquired at great effort and expense. *See* Exhibit C.

35. Millett understood that disclosing, divulging, reveling or using Marsh's confidential information, other than in the performance of his job for Mash, would be detrimental to Marsh and cause it so to suffer serious loss of business and pecuniary damage. *See* Exhibit C.

36. Thus, Millett agreed that the would not while employed by Marsh and for so long thereafter as the information remained confidential, use, disseminate, or disclose Marsh's confidential information to any other person, organization, or entity, except in the performance of his job or as authorized by Marsh. *See* Exhibit C.

37. By signing the Marsh Confidentiality Agreement, Millett acknowledged that his breach of these nonsolicitation obligations would cause irreparable injury to Marsh for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the confidentiality obligations Marsh would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.

38. The MMC Restrictive Covenants Agreement Millett electronically signed in March 2022 also contains confidentiality obligations.

39. By electronically signing the MMC Restrictive Covenants Agreement, Millett agreed that he would not use for his own or another's purposes, or disclose to any other person or entity (other than in the proper course of his employment with Marsh) any of Marsh's confidential information. *See* Exhibit B.

40. Millett agreed that upon his termination from employment he would return all documents and files containing Marsh's confidential information, and all Marsh property, including the laptops and iPhones provided to him. He also agreed to provide all passwords, passcodes, and security PINs to Marsh upon his termination.

**Millett's Resignation and Improper Solicitation of Marsh's Clients**

41. On June 2, 2022, Millett told me by phone that he had been offered a position at Lockton, a direct competitor of Marsh.

42. The following day, Marsh countered in an attempt to retain Millet.

43. Millett declined. On June 6, 2022, Millett sent me an email confirming that he was voluntarily resigning his employment with Marsh to take the position at Lockton.

44. Marsh accepted Millett's resignation, but knowing that Millett was leaving to go to a direct competitor, we did not require Millett to work the two-week notice period he provided, to safeguard its confidential information and its clients from unfair competition.

45. Instead, we allowed Millett to stop working on June 8, 2022, but remain on payroll through Friday, June 17, 2022—the end of the two-week notice period.

46. One June 7, 2022, the day after Millett resigned, Collette Frank, a People Partner for MMC, emailed him "a note with a few things to be mindful of before/after" his departure. She attached to the emails a copy of Millett's Marsh Non-Solicitation Agreement and Marsh Confidentiality Agreement and told Millet to let her know if he had questions about the agreements. Frank copied me on the email.

47. Millett responded by asking if he could forward the agreements to his personal email for future reference and Frank agreed.

48. On June 14, 2022 Frank sent Millett a second email informing him that Marsh would send a box to his home address for so he could return his company-issued iPhones, laptop, badge.

49. Millett returned the iPhones and laptop that Marsh provided him, but did not initially provide Marsh with the correct passcode to access one of his two iPhones.

50. Upon information and belief, Millett commenced employment with Lockton the following Monday, June 19, 2022.

51. In the days immediately following his resignation, Millett solicited several Marsh clients with whom he had prior dealing while employed by Marsh.

52. For example, on June 16, 2022, while still on Marsh's payroll, Millett emailed from his personal Gmail account to a Marsh client with whom he worked while at Marsh. He wrote: "Do you have a few minutes to catch up?" The client did not respond.

53. The next day, while still on Marsh's payroll, Millett sent a follow-up email from his Gmail account: "please let me know if there is a good time or two early next week for a quick catch-up call." Again, the client did not respond.

54. On July 12, 2022, Millett, by this time working for Lockton, sent a third email to the same Marsh client asking for "a few minutes to chat about the insurance piece" of a deal.

55. This time the client responded, the same day, clarifying it was working with Marsh on the deal and that it was covered for its directors and officers liability insurance.

56. Around that same time, Marsh learned that Millett had solicited additional Marsh clients with whom he worked while employed by Marsh and used confidential information to do so.

57. Millett called an insurance company with whom he regularly worked while employed by Marsh and asked the insurance company representative for details about the terms of a policy Marsh had brokered for a client thought the insurance company. The insurance company notified me.

58. I also learned that Millett was suggesting to clients that they cancel their existing insurance policies, midterm, so he could broker a new policy on better terms. This practice is generally frowned upon in the insurance brokerage industry because (1) insurance carriers do not want full term (not partial) information about claims made during prior policy terms, and (2) the practice angers insurance carriers who may lose a policy holding client to a competitor.

59. More to the point, Millett could not have offered better terms to clients unless he was referencing each client's individual policy terms—information that Marsh treats as confidential and which Millett would only have access to for Marsh clients as an employee of Marsh.

60. On July 13, 2022, Marsh received notification that two clients moved their business from Marsh to Lockton, including the client he called the insurance company about.

61. On July 14, 2022, Carolyn Rincon, Assistant General Counsel of Employment for MMC, emailed a cease and desist letter to Millett advising Millett that he violated his contractual obligation by soliciting certain restricted Marsh Clients, and demanding that Millett confirm in writing that he (i) would cease and desist from violating his non-solicitation obligations to Marsh, and (ii) has returned, not retained, and not disclosed to Lockton Marsh's confidential information.

62. The cease and desist letter was copied to Randi Tangney, VP, Counsel, Employment & Litigation for Lockton.

63. Millett did not respond to the cease and desist letter.

64. On July 18, 2022, Millett sent a fourth email to the Marsh client he solicited on June 16, June 17, and July 12. In his fourth email, Millett wrote, "Any chance one or both of you could spare 5 minutes for a quick chat?"

65. This time the client contact forwarded the email to his contact at Marsh, Jolie Small, and commented that he was unsure about why Millett "keeps reaching out on a private email address."

66. Small forwarded the email to John Umbach and Andrew Fiscella, who assumed co-leadership roles for Marsh's SPAC Group following Millett's departure, and who reported to me.

67. Around that same another client ("Client A") contacted Umbach and told him they wanted a call to see where their business with Marsh stood. Client A's representative told Umbach that Millett had recently contacted them, told them the market had changed, and expressed to them that they could do better if they moved their business to Lockton.

68. On July 19, 2022, Marsh received notice that two more clients with who Marsh had worked during his employment with Marsh were moving their business to Lockton. One of the departing clients was Client A.

69. On July 22, 2022, Marsh received notice that a fifth client with whom Millett work while employed by Marsh, was moving its business to Lockton.

70. On July 27, 2022, Marsh received notice that a sixth client with whom Millett work while employed by Marsh, was moving its business to Lockton.

71. And On August 1, 2022, Marsh received notice that a seventh client with whom Millett work while employed by Marsh, was moving its business to Lockton.

72. While at Marsh, Millett worked closely with all seven clients who moved their business from Marsh to Lockton in the last few weeks, including serving as the client originator or principal client contact for many of the departing clients.

73. Upon information and belief, Millett is providing services to all seven of the clients who moved their business from Marsh to Lockton since Millet's resignation from Marsh and hire by Lockton.

Dated: August __, 2022

August 3, 2022 | 12:37 EDT

DocuSigned by:

*James Beatty*

EE62C796C5934CB...

James Beatty