UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH USA INC., | Case No.: 22-cv-06656 (JMF) |
| Plaintiff, | |
| -against- | **SECOND AMENDED COMPLAINT** |
| MICHAEL MACHUA MILLETT, | |
| Defendant. | |

Plaintiff Marsh USA Inc., as for its Complaint against its former employee, Michael Machua Millett ("Millett" or "Defendant"), alleges:

## **INTRODUCTION**

1.     Marsh's Special Purpose Acquisition Company (SPAC) Group is under attack by its former leader (Millett). Millett is unabashedly using Marsh's confidential information and the relationships Millett developed while at Marsh, at Marsh's expense, to unfairly compete.

2.     Marsh sues to enforce Millett's contractual promises, to protect Marsh's client relationships, confidential information, and goodwill, and to prevent irreparable injury to Marsh's business interests.

3.     Marsh employed Millett for nearly 12 years, most recently as a Managing Director in Marsh's Financial and Professional Liability (FINPRO) Practice, where he led Marsh's special purpose acquisition company (SPAC) group.

4.     Between 2010 and 2022, Millett signed several agreements with Marsh that restricted him from soliciting certain Marsh clients for a one-year period following his separation of employment and prevented him from using or disclosing Marsh's confidential information, except in the performance of his job for Marsh, for so long as that information remined confidential.

5.      In exchange for Millett's promises, Marsh employed Millett in a senior role, paid him a substantial six-figure salary, granted him substantial bonus compensation and equity, and gave him access to Marsh's confidential information.

6.      Marsh expected Millett, a trained lawyer, would comply with his contractual nonsolicitation and nondisclosure obligations. He did not.

7.      In early June 2022, Millett resigned his employment and immediately began soliciting Marsh's clients, using confidential information he learned at Marsh, on behalf of his new employer, Northeast Series of Lockton LLC ("Lockton"), a direct competitor of Marsh in the insurance brokerage and risk management industry.

8.      In the weeks following Millett's departure, Marsh lost seven clients to Lockton, all of which were serviced by Millett while he worked for Marsh.

9.      Additional Marsh clients with whom Millett worked while at Marsh choose to remain with Marsh but confirmed to Marsh's employees that Millett had solicited their business since leaving Marsh.

10.      Marsh sent a cease and desist letter to Millett and Lockton, but neither meaningfully responded.

11.      Millett's blatant and unabated disregard of his non-solicitation obligations has caused and is continuing to cause irreparable harm to Marsh such that immediate injunctive relief is necessary and warranted.

**PARTIES**

12.     Plaintiff Marsh is a citizen of Delaware, where it is incorporated, and New York, where it has its principal place of business, located at 1166 Avenue of the Americas, New York, New York. Marsh is a wholly owned subsidiary of Marsh & McLennan Companies, Inc., ("MMC," and together with Marsh, the "Company") and is a leader in insurance brokering and risk management.

13.     Defendant Millett is a natural person and a citizen of Massachusetts, who, upon information and belief, resides at 123 Grove Street, North Attleboro, MA 02760. He is a former employee of Marsh and a current employee of Lockton.

**JURISDICTION AND VENUE**

14.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1332 because this is an action between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because under the forum selection clause in Millett's Non-Solicitation Agreements and Confidentiality Agreement with Marsh, this Court is the only federal venue for any action arising from the agreements. Defendant is also all subject to personal jurisdiction in New York because he engaged in intentional and tortious conduct directed at Marsh, knowing it is in New York, and calculated to harm Marsh in New York. Marsh, whose principal place of business is in New York, is damaged and continues to be damaged in New York.

**FACTUAL ALLEGATIONS**

16.     Marsh is a global leader in insurance brokering and risk management, bringing global, national, and industry-specific solutions.

**Millett's Employment**

17.     Millett began his employment with Marsh in June 2010 as Senior Client Advisor and Global Practice Leader within Marsh's FINPRO Department in the Boston, Massachusetts office.

18.     Millett's officer title for Marsh was Senior Vice President. He was later promoted to Managing Director in or around 2015.

19.     Before joining Marsh, Millett had no experience working in the insurance industry. He was a commercial lawyer in private practice who brought no clients with him from his law firm job.

20.     Between 2010 and 2020, Millett primarily worked on Marsh's private equity, mergers, and acquisitions (PEMA) team performing claim advocacy work.

21.     Then, in 2020, Marsh appointed Millett as the leader of its SPAC group, working with investors who had formed SPACs to raise capital for initial public offering and for acquiring or merging with companies.

22.     In this new role, Millett led a team of risk specialists in helping SPAC clients identify risks, customize programs, and secure directors and officers liability (D&O) insurance policies throughout the life cycle of the SPAC, including the ultimate merger, known as a de-SPAC transaction. He marketed Marsh's SPAC expertise and solutions to potential SPAC clients, and was also responsible for servicing SPAC clients originated by other Marsh employees.

23.     Millett relied on financial and internal resources from Marsh to generate business, service clients, and manage client relationships. He developed client relationships because of his employment, and supported by an experienced team of Marsh employees, on whom he relied on to carry out his job duties.

24.    Marsh also supported Millett's client-facing role by financing client-related expenses, sponsoring client events, and investing in marketing collateral and sales tools, all of which Millett used to form and strengthen client relationships.

### Millett's Exposure to Confidential Information

25.    In his position for Marsh, Millett became intimately familiar with Marsh's confidential information, including, without limitation:

- Client lists and client contact information, including phone numbers and email
- addresses, and documents compiling information about Marsh's clients;
- Prospective client lists and target businesses;
- Current and historical client account information, including client needs and
- preferences, insurance, and purchasing and buying preferences, premium
- amounts, terms of insurance policies, loss ratios, and experiences, exposure data, surety needs, and arrangements, and compilations of them;
- Financial information, such as client pricing information and revenue received per client, and compilations of them;
- Insurance program, project, and carrier information;
- Marsh's business development plans, products, strategies, revenue projections, financial planning, and accounts receivable information;
- The terms of Marsh's agreements and financial arrangements with its clients;
- Marsh's internal operating, management, selling, marketing, and administrative materials;
- Marsh's methods, processes, proprietary databases, and benchmarking analyses; and
- Marsh's sales, marketing, and business strategies.

26.    Marsh protects its confidential information by requiring that such information be stored and remain on Marsh's password-protected network and devices, including the phones and laptops Marsh provided Millett and the databases to which it gave him access.

27.    Marsh also protects its confidential information, and its client relationships and goodwill, by requiring employees with access to confidential information to sign non-solicitation agreements and confidentiality agreements.

## Millett's Non-Solicitation Agreements

28.    During his employment with Marsh, Millett signed several non-solicitation agreements, which provided him with various economic benefits in exchange for certain post-employment obligations (collectively, the "Non-Solicitation Agreements").

29.    On June 29, 2010, in exchange for his employment by Marsh, eligibility to participate in certain bonus compensation plans, and access to confidential information—all of which he received—Millett signed a Marsh USA Inc. Non-Solicitation Agreement, a copy of which is attached to this Complaint as **Exhibit A** (the "Marsh Non-Solicitation Agreement").

30.    By signing the Marsh Non-Solicitation Agreement, Millett acknowledged that as an employee of Marsh he would have contact with a significant number of the Company's clients and prospective clients, and would have access to confidential information relating to those clients and prospective clients. *See* Exhibit A.

31.    Millett agreed that for twelve months following his separation from employment with Marsh he would not: (i) solicit the Company's clients for the purpose of selling or providing consulting services, projects, or products of the type sold or provided by the Company; (ii) induce clients or prospective Company clients to terminate, cancel, or discontinue business with the Company, or (iii) perform or supervise the performance of consulting services, projects, or products of the type sold or provided by the Company to any Company clients or prospective clients.

32.     These nonsolicitation restrictions were limited only to those clients or prospective clients of the Company with whom Millett had contact or about whom Millett obtained confidential information within the last two years of his employment with Marsh.

33.     By signing the Marsh Non-Solicitation Agreement, Millett acknowledged that his breach of these nonsolicitation obligations would result in irreparable injury to Marsh for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the nonsolicitation obligations, Marsh would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.

34.     In addition, in exchange for his receipt of the Company's Long Term Incentive awards of restricted stock (which he received), most recently on or about March 20, 2022, Millett electronically signed and agreed to be bound by a Restrictive Covenants Agreement with MMC and its affiliates and subsidiaries (including his employer, Marsh). Attached as **Exhibit B** is a copy of this agreement, together with Millet's electronically signed grant agreement (the "MMC Restrictive Covenants Agreement").

35.     In the MMC Restrictive Covenants Agreement, Millett again acknowledged that solely by reasons of his employment with Marsh, he had and would "come into contact with and develop and maintain relationships with a significant number of [the Company's] clients and prospective clients." *See* Exhibit B.

36.     Thus, like the Marsh Non-Solicitation Agreement, the MMC Restrictive Covenants Agreement prevents Millett, for twelve-months following the end of his employment, from soliciting certain Company clients for the purpose of selling or providing products or services of the type he sold or provided while employed by the Marsh. *See* Exhibit B.

37.     This restriction is narrowly tailored to cover only those Company clients with whom Millett had contact or confidential information about during the final two years of his employment with Marsh.

38.     Millett expressly acknowledged and agreed that the nonsolicitation restriction in the MMC Restrictive Covenants Agreement were reasonable and necessary to protect the Company's legitimate business interests, were reasonable in view of the consideration he would receive for signing the agreement, and would not prevent him from obtaining employment within his field of expertise.

39.     Millett also acknowledged that his breach of the nonsolicitation obligations in the MMC Restrictive Covenants Agreement would result in irreparable injury to Marsh for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the nonsolicitation obligations Marsh would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.

**Millett's Confidentiality Agreements**

40.     On the same day Millett signed the Marsh Non-Solicitation Agreement (June 29, 2010), Millett also signed a Marsh USA Inc. Confidentiality Agreement, a copy of which is attached to this Complaint as **Exhibit C** (the "Marsh Confidentiality Agreement").

41.     By signing the Marsh Non-Solicitation Agreement, Millett acknowledged that as an employee of Marsh he would learn or have access to highly confidential and sensitive information and trade secrets about Marsh, its operation, and its clients. *See* Exhibit C.

42.     Millett also acknowledged that Marsh is engaged in a highly competitive business and that its competitive position depends on its ability to maintain the confidentiality of

confidential information the Company developed, compiled, and acquired at great effort and expense. *See* Exhibit C.

43.     Millett understood that disclosing, divulging, reveling or using the Company's confidential information, other than in the performance of his job for Mash, would be detrimental to Marsh and cause it so to suffer serious loss of business and pecuniary damage. *See* Exhibit C.

44.     Thus, Millett agreed that he would not while employed by Marsh and for so long thereafter as the information remained confidential, use, disseminate, or disclose the Company's confidential information to any other person, organization, or entity, except in the performance of his job or as authorized by Marsh. *See* Exhibit C.

45.     By signing the Marsh Confidentiality Agreement, Millett acknowledged that his breach of these nonsolicitation obligations would cause irreparable injury to Marsh for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the confidentiality obligations Marsh would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.

46.     The MMC Restrictive Covenants Agreement Millett electronically signed in March 2022 also contains confidentiality obligations.

47.     By electronically signing the MMC Restrictive Covenants Agreement, Millett agreed that he would not use for his own or another's purposes, or disclose to any other person or entity (other than in the proper course of his employment with Marsh) any of Marsh's confidential information. *See* Exhibit B.

48.     Millett agreed that upon his termination from employment he would return all documents and files containing the Company's confidential information, and all Company

property, including the laptops and iPhones provided to him. He also agreed to provide all passwords, passcodes, and security PINs to Marsh upon his termination.

### The Post-Employment Covenants Are Reasonable

49.    The agreements described above all impose a continuing contractual relationship on Millett after his termination from employment with Marsh.

50.    The agreements are each narrowly tailored to protect Marsh's legitimate business interests.

51.    Marsh has a reputation for expertise in the insurance industry and has developed through great expense significant goodwill embodied in its relationships with its clients and the insurance companies whose products are sought by Marsh's clients.

52.    The prohibitions on directly or indirectly soliciting, servicing or otherwise interfering with certain clients and prospective clients protects Marsh's legitimate interest in its client relationships—in which it significantly invested.

53.    Marsh has an interest in prohibiting its employees, to whom it entrusted confidential information, from the disclosure and use of its confidential information to lure customers and employees away from Marsh.

54.    Because the insurance marketplace is an extremely competitive industry, much of the information pertaining to Marsh's business plans, products, services, employees, and clients is considered by Marsh to be confidential information. Marsh has developed and marketed an extremely operation that is highly dependent upon maintaining the secrecy of this information.

55.    The disclosure of this confidential information would put Marsh at a competitive disadvantage, as this information is only valuable if Marsh can maintain its secrecy.

**Millett's Resignation and Improper Solicitation of Marsh's Clients**

56.    On June 2, 2022, Millett informed Marsh's Financial and Professional Liability Practice Group Leader by phone that he had been offered a position at Lockton, a direct competitor of Marsh.

57.    The following day, Marsh countered in an attempt to retain Millet.

58.    Millett declined. On June 6, 2022, Millett voluntarily resigned his employment with

59.    Marsh to take a position as Lockton's Chief Innovation Officer and Alternative Investment Practice Leader within its Lockton Financial Services unit.

60.    Marsh accepted Millett's resignation, but knowing that Millett was leaving to go to a direct competitor, and to safeguard Marsh's confidential information and its clients from unfair competition, Marsh did not require Millett to work the two-week notice period he provided.

61.    Instead, Marsh directed Millett to stop working on June 8, 2022, but informed him that he would remain on payroll through Friday, June 17, 2022—the end of the two-week notice period, which he did.

62.    On June 7, 2022, the day after Millett resigned, Collette Frank, a People Partner for MMC, emailed Millett "a note with a few things to be mindful of before/after" his departure. Frank attached to the email Millett's Marsh Non-Solicitation Agreement and Marsh Confidentiality Agreement and told Millet to let her know if he had questions about the agreements.

63.    Millett responded by asking if he could forward the agreements to his personal email for future reference and Frank agreed.

64.    On June 14, 2022, Frank sent Millett a second email informing him that Marsh would send a box to his home address so he could return his company-issued iPhones, laptop, and badge.

65.     Millett returned the iPhones, laptop, and badge that Marsh provided him, but did not initially provide Marsh with the correct passcode to access one of his two iPhones.

66.     Millett commenced employment with Lockton the following Monday, June 19, 2022.

67.     In its public statement touting Millett's hiring, Lockton emphasized Millett's experience at Marsh. It wrote:

> Millett brings to Lockton deep technical expertise and complex claims experience. He has worked extensively with private equity and venture capital firms, hedge funds, SPACs and companies involved in traditional IPOs and reverse mergers. He joins Lockton from Marsh, where he spent 12 years in a variety of leadership roles, most recently as Chief Innovation Officer in the company's FINPRO Practice.
>
> At Marsh, Millett helped to create a number of innovative insurance coverage solutions, including products focused on wage and hour liability, regulatory investigation costs, intellectual property infringement liability, reputational risk, SPAC and de-SPAC transactions and more.

See https://global.lockton.com/us/en/news-insights/lockton-financial-services-continues-expansion-with-addition-of-marsh (last visited Nov. 10, 2022).

68.     Millett responded to Marsh's promise of continued salary through his notice period by immediately breaching his nonsolicitation and confidentiality obligations.

69.     In the days immediately following his resignation, Millett solicited several Marsh clients with whom he had prior dealing while employed by Marsh.

70.     For example, on June 16, 2022, while still on Marsh's payroll, Millett emailed from to a Marsh client with whom he worked while at Marsh his personal Gmail account. He wrote: "Do you have a few minutes to catch up?" The client did not respond.

71.     The next day, while still on Marsh's payroll, Millett sent a follow-up email to the same Marsh client from his Gmail account: "please let me know if there is a good time or two early next week for a quick catch-up call." Again, the client did not respond.

72.     On July 12, 2022, Millett, by this time working for Lockton, sent a third email to the same Marsh client asking for "a few minutes to chat about the insurance piece" of a deal.

73.     This time the client responded, the same day, clarifying it was working with Marsh on the deal and that it was covered for its directors and officers liability insurance.

74.     Around that same time, Marsh learned that Millett had solicited additional Marsh clients with whom he worked while employed by Marsh and used confidential information to do so.

75.     Millett called an insurance company with whom he regularly worked while employed by Marsh and asked the insurance company representative for details about the terms of a policy Marsh had brokered for a client through the insurance company. The insurance company notified James Beatty, Marsh's FINPRO Practice Group Leader.

76.     Beatty learned that Millett was suggesting to clients that they cancel their existing insurance policies, mid-term, so he could broker a new policy on better terms. This practice is generally frowned upon in the insurance brokerage industry because (1) insurance carriers do not want full term (not partial) information about claims made during prior policy terms, and (2) the practice upsets insurance carriers who may lose a policy holding client to a competitor.

77.     Millett could not have offered better terms to clients unless he was referencing each client's individual policy terms—information that Marsh treats as confidential, and which Millett would only have access to for Marsh clients as an employee of Marsh.

78.     On July 13, 2022, Marsh received notification that two clients moved their business from Marsh to Lockton, including the client Millett called the insurance company about.

79.     On July 14, 2022, Carolyn Rincon, Assistant General Counsel of Employment for MMC, emailed a cease and desist letter to Millett advising Millett that he violated his contractual obligation by soliciting certain restricted Marsh Clients, including the two that departed the day before, and demanding that Millett confirm in writing that he (i) would cease and desist from violating his non-solicitation obligations to Marsh, and (ii) has returned, not retained, and not disclosed to Lockton Marsh's confidential information.

80.     The cease and desist letter was copied to Randi Tangney, VP, Counsel, Employment & Litigation for Lockton.

81.     Millett did not respond to the cease and desist letter and he was undeterred by its content.

82.     On July 18, 2022, he sent a fourth email to the Marsh client he solicited on June 16, June 17, and July 12. In his fourth email, Millett wrote, "Any chance one or both of you could spare 5 minutes for a quick chat?"

83.     This time the client forwarded the email to its contact at Marsh, Jolie Small, and commented that he was unsure about why Millett "keeps reaching out on a private email address."

84.     Small forwarded the email to John Umbach and Andrew Fiscella, who assumed co-leadership roles for Marsh's SPAC Group following Millett's departure.

85.     Around that same time, another client ("Client A") contacted Umbach and told him they wanted a call to discuss their business with Marsh. Client A's representative told Umbach that Millett had recently contacted them, told them the market had changed, and expressed to them that they could do better if they moved their business to Lockton.

86.     On July 19, 2022, Marsh received notice that two more clients with who Millett had worked during his employment with Marsh were moving their business to Lockton. One of the departing clients was Client A.

87.     On July 22, 2022, Marsh received notice that a fifth client with whom Millett work while employed by Marsh, was moving its business to Lockton.

88.     On July 23, 2022, MMC's Assistant General Counsel, Carolyn Rincon, sent a follow-up email to Millett starting that Marsh had not received any response from him to its July 14 cease and desist letter, but rather had only received more evidence that Millett is breaching his nonsolicitation obligations.

89.     In the email, Rincon requested the passcode for one of the two iPhones Millett returned to Marsh.

90.     Unsurprisingly, Millett did not respond, but he eventually provided the passcode through Ms. Tangney, Lockton's in-house lawyer.

91.     The losses continued. On July 27, 2022, Marsh received notice that a sixth client with whom Millett work while employed by Marsh, was moving its business to Lockton.

92.     And on August 1, 2022, Marsh received notice that a seventh client with whom Millett work while employed by Marsh, was moving its business to Lockton.

93.     While at Marsh, Millett worked closely with all seven clients who moved their business from Marsh to Lockton in July and August 2022, including serving as the client originator or principal client contact for many of the departing clients.

94.     Upon information and belief, Millett is providing services to all seven of the clients who moved their business from Marsh to Lockton since Millet's resignation from Marsh and hire by Lockton.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract – Non-Solicitation of Clients)

95.     Marsh repeats and realleges every allegation in Paragraphs 1 through 94 as if set forth herein.

96.     The Non-Solicitation Agreements Millett signed are valid and enforceable.

97.     Under the Non-Solicitation Agreements, Millett is prohibited for twelve months following his separation from directly or indirectly: (i) soliciting certain Company clients for the purpose of selling or providing consulting services, projects, or products of the type he sold or provided while employed by Marsh; or (ii) inducing certain Company clients and prospective clients to terminate, cancel, or discontinue business with the Company; or (iii) performing or supervising the performance of consulting services, projects, or products of the type he sold or provided while employed by Marsh on behalf of any Company clients or prospective clients.

98.     Millett violated his Non-Solicitation Agreements by soliciting, servicing or otherwise interfering with Marsh's relationships with its clients or prospective clients in violation of his Non-Solicitation Agreements.

99.     Marsh fully performed its obligations under the agreements.

100.    As direct and proximate result of Millett's breaches of his Non-Solicitation Agreements, Marsh has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer this harm unless Millet is restrained from his current conduct and is compelled to abide by his Non-Solicitation Agreements.

101.    As a direct and proximate result of Millett's breach of the Non-Solicitation Agreements, Marsh has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Confidential Information)

102.    Marsh repeats and realleges every allegation in Paragraphs 1 through 101 as if set forth herein.

103.    The confidentiality provisions of the Marsh USA Confidentiality Agreement and the MMC Restrictive Covenants Agreement (collectively, the "Confidentiality Agreements") are valid and enforceable.

104.    Under the Confidentiality Agreements, Millett is prohibited from directly or indirectly using, disseminating, or disclosing the Company's confidential information, except as required to carry out his duties as an employee of Marsh.

105.    Upon information and belief, Millett has used or disclosed, or threatens to use or disclose, the Company's confidential information, in violation of his Confidentiality Agreements.

106.    Marsh fully performed its obligations under the Confidentiality Agreements.

107.    As direct and proximate result of Millett's breaches of the Confidentiality Agreements, Marsh has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer this harm unless Millett is restrained from his current conduct and is compelled to abide by the Confidentiality Agreements.

108.    As a direct and proximate result of Millett's breaches of the Confidentiality Agreements, Marsh has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duties)

109.    Marsh repeats and realleges every allegation in Paragraphs 1 through 108 as if set forth herein.

110.    Millett was employed by Marsh in a position of trust and confidence.

111.    By virtue of his position at Marsh, Millett owed a fiduciary duty and a duty of loyalty to Marsh both during and after his employment and was obligated not to divert Marsh's business in which it had a tangible expectancy, and not to subvert or misappropriate Marsh's confidential information.

112.    Millett breached his fiduciary duties owed to Marsh by directly or indirectly soliciting or diverting Marsh's clients and business opportunities, in which it had a tangible expectancy, to Lockton, a direct competitor, or subverting or misappropriating Marsh's confidential information.

113.    As a direct and proximate result of Millett's breaches of his fiduciary duties, Marsh has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer this harm unless and until Millett is restrained from taking further actions in breach of his fiduciary duties to Marsh.

114.    As a direct and proximate result of Millett's breaches of his duties of loyalty, Marsh has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

115.    Millett committed his actions knowingly, willfully, and in conscious disregard of Marsh's rights. Thus, Marsh is entitled to recover actual and exemplary damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Tortious Interference with Existing and Prospective Business Relationships)**

116.    Marsh repeats and realleges every allegation in Paragraphs 1 through 115 as if set forth herein.

117.    Because of his employment with Marsh, Millett was intimately familiar with, and had detailed knowledge about, the business relationships that existed between Marsh and certain clients.

118.    Millett used Marsh's confidential information to unlawfully solicit Marsh's clients, and was motivated by a desire to obtain an unfair advantage in its competition with Marsh, and to damage or injure Marsh's business, goodwill, reputation, or standing in the marketplace.

119.    Millett intentionally, with malice, and without privilege or justification, interfered with Marsh's business relationships with certain clients using unfair or improper means, or with the intent to interfere with such relationships.

120.    Marsh possesses a protectable interest in its contracts and relations with its clients because it has a reasonable expectation of their continued association with Marsh.

121.    Defendant's conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of Marsh.

122.    As a direct and proximate result of Defendant's interference Marsh has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

123.    Marsh will suffer this harm unless Defendant is restrained from his current and intended conduct.

124.    As a direct and proximate result of Defendant's interference, Marsh has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Unfair Competition)

125.    Marsh repeats and realleges every allegation in Paragraphs 1 through 124 as if set forth herein.

126.    Upon information and belief, Defendant engaged in unfair methods of competition because he unlawfully seized, appropriated and used unfair advantages in his competition with Marsh from his  breach of his Non-Solicitation and Confidentiality Agreements, his breach of his fiduciary duty and duty of loyalty, and his interference with Marsh's business, advantages, and prospective economic relations, all of which are more fully set forth above.

127.    The conduct has resulted in the pirating of Marsh's confidential information.

128.    Upon information and belief, Millett was and is driven by unlawful predatory motives and malice, or acted in knowing or reckless disregard of the rights and interests possessed by Marsh in its attempts to obtain an unfair advantage over Marsh and to damage or injure Marsh in the industries within which Millett's new employer, Lockton, competes with Marsh.

129.    Upon information and belief, Millett is and was driven by unlawful predatory motives and malice toward Marsh, or acted in reckless disregard for the rights and interests of Marsh, in his attempts to obtain an unfair competitive advantage over Marsh and to damage or injure Marsh in the industries within which Millett's new employer, Lockton, competes with Marsh.

130.    As a direct and proximate result of Millett's conduct Marsh has been damaged in that, for example and without limitation: (1) the name, reputation, and goodwill of Marsh has been damaged; (2) a direct competitor has secured Marsh's confidential information and trade secrets; (3) Marsh has lost business, in an amount unable to be determined at this time; and (4) the damages suffered by Marsh is expected to continue and multiply because of ongoing breaches by Defendant.

131.    As a direct and proximate result of Defendant's conduct Marsh has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

132.    Marsh will suffer this harm unless Defendant is restrained from his current and intended conduct.

133.    As a direct and proximate result of Defendant's unlawful competition, Marsh has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

**WHEREFORE**, Marsh requests that judgment be made and entered against Defendant and for Marsh, as follows:

(a) Enjoining and restraining Defendant, and any person or entity acting in concert with him or under his supervision, through June 17, 2023, and as extended during any period that Millett breached his obligations to Marsh, from, soliciting or servicing, or inducing not to place business with Marsh, any clients of Marsh with whom Millett had contact, or about whom Millett obtained confidential information during the last two years of his employment;

(b) Enjoining and restraining Defendant, and any person or entity acting in concert with him or under his supervision, from possessing, using, disclosing or disseminating Marsh's confidential information;

(c) Enjoining Defendant, and any person or entity acting in concert with him or under his supervision, from any other actions in violation of Millett's contractual obligations or fiduciary duties owed to Marsh;

(d) Awarding compensatory damages and interest to Marsh in an amount to be determined at trial;

(e) Awarding exemplary and punitive damages; and

(f) Granting Marsh its costs and disbursements in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

Dated: November 10, 2022

LITTLER MENDELSON P.C.

By: */s/ Shawn Matthew Clark*
    A. Michael Weber
    Shawn Matthew Clark
    James Horton
    900 Third Avenue
    New York, NY 10022.3298
    Telephone: (212) 583-9600
    MWeber@littler.com
    SMClark@littler.com
    JHorton@littler.com

*Attorneys for Plaintiff Marsh USA Inc.*